NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11851

PETERBOROUGH OIL COMPANY, LLC  vs.  DEPARTMENT OF ENVIRONMENTAL
PROTECTION.


Worcester.     October 8, 2015. - June 6, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Hazardous Materials.  Oil and Gas.  Department of Environmental
Protection.  Statute, Construction.  Administrative Law,
Agency's interpretation of regulation.  Regulation.
Massachusetts Oil and Hazardous Material Release Prevention
Act.



Civil action commenced in the Superior Court Department on
August 27, 2013.

The case was heard by William F. Sullivan, J., on motions
for summary judgment.

The Supreme Judicial Court granted an application for
direct appellate review.


Robert D. Cox, Jr., for the plaintiff.
Eric S. Brainsky for Independent Oil Marketers Association
of New England.
Maryanne Reynolds, Assistant Attorney General, for the
defendant.
Edward J. DeWitt, for Association to Preserve Cape Cod,
amicus curiae, submitted a brief.
Donald D. Cooper, for LSP Association, Inc., amicus curiae,

submitted a brief.

DUFFLY, J.  After a spill of hazardous materials within a specified radius of a public water supply, Department of Environmental Protection (DEP) regulations require that those deemed to be liable undertake cleanup and monitoring actions to ensure the spill does not pose a danger to that water supply. See 310 Code Mass. Regs. §§ 40.0801, 40.0810, 40.0993(3)(a) (2014); 40.1030(2)(e) (2015).  An exemption promulgated in 2007, however, exempts "oil" from some of these requirements when other enumerated requirements are met.  See 310 Code Mass. Regs. § 40.0924(2)(b)(3)(a) (2014) (oil exemption).  The DEP's definition of the term "oil" in this "oil exemption" is at the heart of this lengthy litigation between DEP and Peterborough Oil Company, LLC (Peterborough).

Peterborough owns a property, now vacant, in Athol, where it operated a gasoline station for more than ten years.[1]  The property is located within a protection area for public water supply wells.  In 1994, a release of leaded gasoline that originated from a subterranean gasoline storage tank was detected in soil on the site.  Since then, DEP has required Peterborough to undertake supervised cleanup and monitoring activities at the site.  In 2008, shortly after the oil

---

[1] The facts are drawn from the undisputed facts in the summary judgment record.

exemption was established, Peterborough submitted a revised remediation plan to DEP, stating that further remediation was not required because the entirety of the leaded gasoline spilled falls within the definition of "oil" for purposes of the exemption.  In 2011, DEP audited the site and issued a notice to Peterborough that the revised remediation plan did not comply with departmental requirements.  The DEP explained that the meaning of "oil" in the exemption does not include gasoline additives such as lead.  According to DEP, "oil" within the exemption refers only to the petroleum hydrocarbons naturally occurring in oils, but not to any additives such as lead.  A spill of leaded gasoline, therefore, could not be completely excluded from further remediation under the "oil exemption."  The DEP denied Peterborough's request for reconsideration.

Peterborough thereafter filed an action in the Superior Court seeking declaratory and injunctive relief, contending that DEP's interpretation of its regulation was incorrect.  Concluding that DEP's interpretation was reasonable, a Superior Court judge granted its motion for summary judgment, and issued a judgment declaring that "oil" within the meaning of the oil exemption is limited to petroleum hydrocarbons and does not include gasoline additives such as lead; the judge denied Peterborough's cross motions for summary judgment and injunctive

relief.[2]  Peterborough appealed, and we granted its petition for direct appellate review.  We conclude that DEP's interpretation of its regulation is reasonable, and affirm the judgment.[3]

Discussion.  A declaratory judgment may be sought in "any case in which an actual controversy has arisen."  See G. L. c. 231A, § 1.  The requirement that there be an "actual controversy" should be construed liberally.  See Gay & Lesbian Advocates & Defenders v. Attorney Gen., 436 Mass. 132, 134 (2002).  An "actual controversy" may exist without final agency action, on the basis of an allegation that an improper agency interpretation of a regulation will harm the plaintiff.  See Santana v. Registrars of Voters of Worcester, 384 Mass. 487, 493 (1981), S.C., 390 Mass. 353 (1983), citing Massachusetts Ass'n of Indep. Ins. Agents & Brokers, Inc. v. Commissioner of Ins., 373 Mass. 290, 293 (1977).  Because none of the material facts are disputed, and Peterborough challenges whether DEP's interpretation of its regulation is correct as a matter of law, declaratory relief is appropriate here.

---

[2] The parties agree that if the oil exemption is not applicable, Peterborough Oil Company, LLC (Peterborough), will be required to engage in ongoing remediation efforts because of the presence of lead in the ground.

[3] We acknowledge the amicus brief in support of Peterborough that was submitted by the Independent Oil Marketers Association of New England; and the amicus briefs submitted by LSP Association, Inc., and by the Association to Preserve Cape Cod.

1.  <u>Statutory and regulatory framework</u>.  The Massachusetts Oil and Hazardous Material Release Prevention and Response Act, G. L. c. 21E (act), was enacted in 1983 to ensure the proper cleanup of sites contaminated with oil and hazardous materials. See G. L. c. 21E, §§ 1, 3; St. 1983, c. 7, § 5.  The act grants DEP broad authority over cleanup of these contaminated sites. See G. L. c. 21E, § 3.  "Oil" is defined under the act as

> "insoluble or partially soluble oils of any kind or origin or in any form, including, without limitation, crude or fuel oils, lube oil or sludge, asphalt, insoluble or partially insoluble derivatives of mineral, animal or vegetable oils and white oil.  <u>The term shall not include waste oil, and shall not include those substances which are included in 42 U.S.C. [§ ] 9601(14)</u>."[4] (Emphasis added).

G. L. c. 21E, § 2.  In addition, to excluding from the definition of "oil" "substances which are included in 42 U.S.C. [§] 9601(14)," "oil" is explicitly excluded from the definition of "hazardous material" under the act.  The act provides that a "hazardous material" is a

> "material including but not limited to, any material, in whatever form, which, because of its quantity, concentration, chemical, corrosive, flammable, reactive, toxic, infectious or radioactive characteristics, either separately or in combination with any substance or substances, constitutes a present or potential threat to

---

[4] The Federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 (2012), (CERCLA) was enacted to address similar concerns involving cleanup of hazardous waste contamination as the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, G. L. c. 21E.  See <u>Martignetti</u> v. <u>Haigh-Farr Inc</u>. 425 Mass. 294, 321 (1997); <u>Griffith</u> v. <u>New England Tel. & Tel. Co</u>. 414 Mass. 824, 827 (1993), <u>S.C.</u>, 420 Mass. 365 (1995).

human health, safety, welfare, or to the environment, when improperly stored, treated, transported, disposed of, used, or otherwise managed.  <u>The term shall not include oil</u>." (Emphasis added).

G. L. c. 21E, § 2.

To implement the cleanup process required under the act, G. L. c. 21E, § 3 (<u>b</u>), DEP promulgated regulations known as the Massachusetts Contingency Plan (MCP).  See 310 Code Mass. Regs. § 40.0001 (2014).  The definitions of "oil" in the MCP is identical to the definition of oil in the act.  See G. L. c. 21E, § 2; 310 Code Mass. Regs. § 40.0006 (2014).

The MCP creates a multiphased assessment and cleanup process whereby a contaminated site can reach either a "temporary" or a "permanent" solution, as determined by DEP. See 310 Code Mass. Regs. §§ 40.0006(2), 40.0006(12).  A temporary solution means that the site has achieved a substantial elimination of hazardous material, but monitoring and mitigation efforts may remain ongoing indefinitely.[5]  A permanent solution means that, having been remediated, the site creates a condition of no significant risk to health, safety,

---

[5] A temporary solution "means any measure or combination of measures which will, when implemented, eliminate any substantial hazard which is presented by a disposal site or by any oil and/or hazardous material at or from such site in the environment until a Permanent Solution is achieved."  310 Code Mass. Regs. § 40.0006 (2015).

public welfare, and the environment.[6]  See 310 Code Mass. Regs. § 40.0006(12).

The MCP also establishes additional cleanup requirements for sites where discharges pose a risk to a public water supply. See 310 Code Mass. Regs. § 40.0924.  These requirements apply within two distinct zones:  Zone I establishes a narrow, protective radius immediately surrounding the water supply; Zone II encompasses a larger area to address the risk that in extreme conditions, water from that location might enter the public water supply.[7]  Peterborough's site is located within a Zone II protective area.  Under the oil exemption, DEP may assume that there is no risk of unacceptable levels of contaminants seeping into a public water supply from a Zone II spill where the "[c]ontaminiation is limited to oil," and when other enumerated site conditions (effecting the likelihood of contaminants

---

[6] A permanent solution "means a measure or combination of measures which will, when implemented, ensure attainment of a level of control of each identified substance of concern at a disposal site or in the surrounding environment such that no substance of concern will present a significant risk of damage to health, safety, public welfare, or the environment during any foreseeable period of time."  310 Code Mass. Regs. § 40.0006.

[7] The Massachusetts Contingency Plan (MCP) defines Zone I as "the area within the protective radius surrounding a public water supply well or wellfield" and Zone II as "that area of an aquifer which contributes water to a well under the most severe pumping and recharge conditions that can be realistically anticipated."  310 Code Mass. Regs. § 40.0006.

reaching the water supply) are met.[8]  See 310 Code Mass. Regs.
§§ 40.0924(2)(b)(3)(a), 40.0926(8) (2014).

Before creating the oil exemption, DEP conducted studies of
the hazards posed by different chemicals released in soil and
groundwater.  These studies showed that petroleum hydrocarbons
are biodegradable and do not tend to travel through soil once
released.  Thus, DEP determined that if released within a
certain radius of a water supply, and where other conditions
were met, petroleum hydrocarbons would not tend to seep into
that water supply.  Based on the foregoing, DEP concluded that
petroleum hydrocarbons pose a low safety risk to the public
water supply when spilled within a specified radius of a
potential water supply.  The DEP, therefore, interprets the oil

_____

[8] Title 310 Code Mass. Regs. § 40.0926(8) (2014) provides
that "[n]o exposure potential" exists as to sites described in
310 Code Mass. Regs. § 40.0924(2)(b)3 if, in addition to the
restriction that "the contamination is limited to 'oil,'" these
conditions are met:

     "(a) Demonstration of source elimination or control at
     the disposal site as described in 310 [Code Mass. Regs.
     §] 40.1003(5); (b) Demonstration of diminishing contaminant
     concentrations throughout the horizontal and vertical
     extent of the plume; (c) Demonstration that contaminant
     concentrations are not detected at or above analytical
     limits appropriate for a GW-1 area [groundwater near a
     public water supply] at the downgradient edge of the plume,
     at least 1,000 feet from the Public Water Supply well; and
     (d) The demonstrations pursuant to 310 [Code Mass. Regs.
     §] 40.0926(8)(b) and (c) are confirmed by a minimum of two
     years of quarterly groundwater monitoring conducted after
     the termination of any Active Remedial System and after the
     achievement of such contaminant concentrations."

exemption to include only petroleum hydrocarbons.[9]

2. Statutory language. Peterborough contends that the act plainly and unambiguously includes leaded gasoline in its definition of "oil." See G. L. c. 21E, § 2. On this view, Peterborough maintains that DEP erred in rejecting Peterborough's revised remediation plan.

As with any statute, we review questions concerning the meaning of an agency's enabling statute de novo. See Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 481 (2006). If the meaning of a term is clear in the plain language of a statute, we give effect to that language as the clearest expression of the Legislature's purpose. See Goldberg v. Board of Health of Granby, 444 Mass. 627, 632-633 (2005). If, however, the statutory language is "sufficiently ambiguous to support multiple, rational interpretations," Biogen IDEC MA, Inc. v. Treasurer & Receiver Gen., 454 Mass. 174, 186 (2009), citing Goldberg v. Board of Health of Granby, 444 Mass. 627, 633

---

[9] "Oil" is frequently understood in terms of its chemical composition of petroleum hydrocarbons. See Chambers Dictionary of Science and Technology 807, 854 (1999); McGraw-Hill Dictionary of Scientific and Technical Terms 1466, 1569 (6th ed. 2003). See also Environmental Science Deskbook §§ 2:58, 3:84 (Conrad, ed. 2014) (stating that petroleum products are category of petroleum hydrocarbons, and various fuel oils result from process of creating fractions of petroleum hydrocarbons). Standard dictionaries of the English language define "oil" similarly. See, e.g., Webster's New Universal Unabridged Dictionary 1346, 1449 (2003); American Heritage Dictionary of the English Language 1257, 1355 (3d ed. 1992).

(2005), we look to "the cause of [the statute's] enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated" (citation omitted).  Entergy Nuclear Generation Co. v. Department of Envtl. Protection, 459 Mass. 319, 329 (2011).  While the "duty of statutory interpretation is for the courts . . . an administrative agency's interpretation of a statute within its charge is accorded weight and deference . . . Where the [agency's] statutory interpretation is reasonable . . . the court should not supplant [its] judgment" (citations omitted).  Dowling v. Registrar of Motor Vehicles, 425 Mass. 523, 525 (1997), quoting Massachusetts Med. Soc'y v. Commissioner of Ins., 402 Mass. 44, 62 (1988).  "Our deference is especially appropriate where, as here, the statutes in question involve an explicit, broad grant of rule-making authority."  Goldberg v. Board of Health of Granby, supra at 634.  See Dowell v. Commissioner of Transitional Assistance, 613-614 (1997).

In support of its claim that DEP's understanding of the term "oil" is incorrect under the plain language of the act, Peterborough argues that the statutory definition of "oil" is broad, encompasses any type of fuel or crude oil, and explicitly defines gasoline as a "partially soluble" "fuel oil" derived from a "mineral" oil.  This argument, however, does not take

into account that the statute then excludes from the definition of "oil" a list of substances, identified as "hazardous" under § 9601(14) of the Federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 (2012) (CERCLA).  See G. L. c. 21E, § 2.  Lead is included on one of the CERCLA lists of hazardous substances, see 40 C.F.R. § 302.4 (2015), and therefore is excluded from the act's definition of "oil."  See G. L. c. 21E, § 2.

While it distinguishes between "oil" and "hazardous substances," the act does not explain how a hazardous substance intermixed with an oil should be treated.  For our purposes, it does not specify how to treat the lead in leaded gasoline, where lead is "hazardous," but other parts of the mixture fall within the oil exemption.  This ambiguity is not resolved by the reference in the act to CERCLA's definition of hazardous materials.

CERCLA's definition of hazardous materials contains a so-called "petroleum exclusion" explicitly providing that petroleum may be excluded from certain cleanup requirements.  See 42 U.S.C. § 9601(14).  Leaded gasoline has been understood to fall within this "petroleum exclusion," albeit that lead is a hazardous substance, because of CERCLA's use of the term "petroleum."  See, e.g., Wilshire Westwood Assocs. v. Atlantic Richfield Corp., 881 F.2d, 801, 803-804 (9th Cir. 1989).  The

act, however, does not incorporate CERCLA's "petroleum exclusion."  To the contrary, the act's definition of oil does not use the term "petroleum," and does not define "oil" by reference to the definition of "petroleum" in CERCLA.  On its face, the language defining "oil" in the act incorporates only that portion of the CERCLA definition that enumerates materials that are "hazardous substances."  The act's definition of "oil" does not explicitly incorporate CERCLA's exceptions to its enumeration of "hazardous materials."  Indeed, the oil definition does not use the term "hazardous substance."

The act as a whole also creates greater liability for cleanup of oil spills than does CERCLA.  See Griffith v. New England Tel. & Tel. Co. 414 Mass. 824, 830 (1993).  Nothing in the act's language suggests that its definition of "oil" is meant to be coextensive with that of CERCLA, or to include CERCLA's exclusions of certain hazardous substances.  See Id. at 829-830.  We therefore do not agree that the act unambiguously incorporates CERCLA's "petroleum exclusion."  See ACME Laundry Co. v. Secretary of Envtl. Affairs, 410 Mass. 760, 771 (1991), quoting Globe Newspaper Co. v. Boston Retirement Bd., 388 Mass. 427, 432-433 (1983) (declining to interpret act in light of CERCLA because differences in language represent "a decision to reject the legal standards embodied or implicit in" CERCLA).  See also DaRosa v. New Bedford, 471 Mass. 446, 452 (2015);

Martignetti v. Haigh-Farr Inc., 425 Mass. 294, 321 (1997) (differences in statutory language require differing applications of similar provisions in CERCLA and act). Accordingly, we are unable to read into the statutory language a plain indication that the Legislature meant to include leaded gasoline within the definition of "oil," where the definition also provides that lead is not an "oil."

3. Legislative intent. Because the statutory language is ambiguous, we turn to consideration of the legislative intent. See Entergy Nuclear Generation Co. v. Department of Envtl. Protection, supra at 329.

The act "was drafted in a comprehensive fashion to compel the prompt and efficient cleanup of hazardous material," Taygeta Corp. v. Varian Assocs., 436 Mass. 217, 223 (2002). "The purpose of the MCP is, among other things, to 'provide for the protection of health, safety, public welfare and the environment. . . .'" Bank v. Thermo Elemental Inc., 451 Mass. 638, 653 (2008), quoting 310 Code Mass. Regs. § 40.0002 (1995).

The act requires DEP to promulgate regulations to identify, assess, and mitigate sites where there has been a release of hazardous materials, and to establish standards for compliance with cleanup requirements. See G. L. c. 21E, §§ 3A (d), (g). In promulgating these standards, the act requires DEP to "eliminate any substantial hazard to health, safety, public

welfare, or the environment which is presented by the site or by any oil or hazardous materials at or from the site in the environment."  G. L. c. 21E, § 3A (f).

In light of the act's purpose to compel the cleanup of hazardous material, and the legislative mandate that DEP ensure compliance with that purpose, interpreting leaded gasoline entirely as an "oil" would stretch the meaning of the "oil exemption" to the point that it would become virtually a nullity.  In particular, under such an expanded definition, any hazardous material mixed with oil would appear to qualify for less stringent treatment under the oil exemption.  Such an interpretation would eviscerate the legislative purpose.  See, e.g., Mullally v. Waste Mgt. of Mass., Inc., 452 Mass. 526, 531 (2008) (statutory construction should not "frustrate the general beneficial purposes of the legislation" [citations omitted]); Watros v. Greater Lynn Mental Health & Retardation Ass'n, 421 Mass. 106, 113 (1995) ("strictly literal reading" of statute should not be adopted if result would "thwart or hamper the accomplishment of the statute's obvious purpose").

4.  Creation of the oil exemption.  Furthermore, the history of DEP's drafting of the "oil exemption" is instructive as to its view, at the time the exemption was enacted, that the lead in leaded gasoline was not included within the definition of "oil."  The DEP created the oil exemption based on concern

that very few sites had achieved a permanent solution after gasoline spills. The DEP, therefore, conducted studies at contaminated sites to determine the reason for the low rate of permanent resolution. Through these studies, DEP determined that, in part, the reason for the low remediation rate was the manner in which the risk assessment to determine whether a temporary or a permanent solution was available at a particular site was conducted.

Under the MCP, DEP determines risk to a public water supply by assessing the concentrations of specific substances, defined by their chemical properties and composition, in the soil near a contaminated site. See 310 Code Mass. Regs. §§ 40.0902(2)(a), 40.0904, 40.0924(2)(b)(3)(a), 40.0996 (2014). Where concentrations of individual substances of particular concern exceed certain levels, a "permanent" solution at a given site is not achievable unless and until those concentrations can be reduced to specified limits. See 310 Code Mass. Regs. § 40.1040(1)(a) and (2)(b) (2015). Prior to DEP's promulgation of its exemption, the MCP deemed contamination by petroleum hydrocarbons (found in every gasoline spill) as hazardous to the public water supply, without factual demonstration that petroleum hydrocarbons actually posed a threat to the safety of drinking water.

The DEP's studies showed that petroleum hydrocarbons had

unique properties. For example, if spilled in soil within a specified area near a potential water supply, the petroleum hydrocarbons did not appear to seep into that water supply. The DEP concluded this was because they were biodegradable, tended to be relatively stationary, and did not move through soil toward groundwater. Therefore, DEP concluded, petroleum hydrocarbons were unlikely to contaminate the drinking supply if released within a distance equating to the Zone II radius of a possible water supply, if all other necessary site conditions were met.

As a result of these studies, DEP created the "oil exemption" as a narrow exemption limited to petroleum hydrocarbons. The exemption applied to Zone II sites (known as GW-1 areas) whose groundwater is located within a potential drinking water source area, but where spill contamination is limited to petroleum hydrocarbons. See 310 Code Mass. Regs. §§ 40.0924(2)(b)(3)(a); 40.0932(4)(a)-(b) (2014).

5. DEP's interpretation of the oil exemption. In DEP's view, limiting the oil exemption to petroleum hydrocarbons comports with the legislative mandate while providing flexibility in remediation efforts of hazardous spills. Only petroleum hydrocarbons have been shown not to present a "significant risk of harm to health, safety, public welfare, or the environment during any foreseeable period of time," assuming

other required conditions for a "permanent" solution are met. See 310 Code Mass. Regs. § 40.0006. Expanding the definition to include contaminants either known to be hazardous, or whose properties are less understood, would contravene the legislative mandate. See 310 Code Mass. Regs. § 40.0007(1) (2014) (MCP "shall be construed to effectuate the purposes of" act).

"An agency's interpretation of its own regulation and statutory mandate will be disturbed only 'if the "interpretation is patently wrong, unreasonable, arbitrary, whimsical, or capricious."'" Box Pond Ass'n v. Energy Facilities Siting Bd., 435 Mass. 408, 416 (2001), quoting TBI, Inc. v. Board of Health of N. Andover, 431 Mass. 9, 17 (2000).

Although the statutory and regulatory definition of "oil" does not explicitly reference the term "petroleum hydrocarbons," DEP consistently has interpreted the oil exemption to apply only to petroleum hydrocarbons. When it issued the proposed exemption for public comment, DEP termed the exemption "Petroleum Hydrocarbons in GW-1 Areas, 40.0924(2)(b)(3)." No comments apparently were received indicating confusion over the term "petroleum hydrocarbons" in this context. One comment indicated that the industry understood the term as a technical term for "oil," which excluded gasoline additives. That comment stated, "Proposal should not be limited to [o]il; it should extend to additives . . . . The limitation to [o]il is likely

to exclude all gasoline and many fuel oil releases."  In response, DEP clearly explained that the exclusion was not intended to include "all gasoline," stating the "proposal was not extended to additives."

Risk assessment under the MCP requires DEP to examine the concentrations of specific substances, defined by their chemical properties and composition, in the public water supply.  See 310 Code Mass. Regs. §§ 40.0902(2)(a), 40.0904, 40.0924, 40.0996. The oil exemption appears in the portion of the regulatory scheme governing response actions to contamination on the basis of risks posed by specific chemicals.  310 Code Mass. Regs. § 40.0924(2)(b)(3)(a).  Because the regulatory scheme relies on distinctions between substances on the basis of chemical composition, DEP's decision to interpret "oil" similarly, as defined with reference to its chemical composition, is reasonable.[10]  See Simmons v. State Examiners of Electricians,

_____

[10] Peterborough challenges the interpretation of the Department of Environmental Protection (DEP) in part because DEP uses a less technical definition of "oil" in some other sections of the MCP, not related to spill cleanup near public water supplies.  Where a term's definition is generally applicable throughout a statute, that term nonetheless may be interpreted differently for purposes of a particular section, if the context so requires.  See Banushi v. Dorfman, 438 Mass. 242, 244-245 (2002); Care & Protection of Jeremy, 419 Mass. 616, 622 (1995). Because the MCP creates additional cleanup requirements near public water supplies, and requires DEP to analyze these requirements on the basis of narrow and technically defined distinctions between chemical substances, DEP can reasonably use a narrow and technical definition for purposes of these

395 Mass. 238, 243 (1985) ("If a word or phrase has a technical or specialized meaning, this court will adopt that meaning in its construction of the statute").

The DEP's more narrow interpretation advances its mandate to ensure the cleanup of spills posing a threat to public health and safety, while reasonably permitting less stringent remediation based on the scientific studies it conducted concerning the observed levels of contamination in the public water supply.  See Northeast Energy Partners, LLC v. Mahar Regional Sch. Dist., 462 Mass. 687, 693 (2012) ("General expressions may be restrained by relevant circumstances showing . . . intent that they be narrowed and used in a particular sense" [citation omitted]).  Peterborough's proffered interpretation, by contrast, would require treatment of hazardous substances such as lead, as though they were not hazardous.  The DEP's interpretation that the oil exemption does not exempt hazardous fuel additives from cleanup requirements reasonably furthers the legislative purpose, and ensures that DEP will exempt from cleanup requirements only those substances that do not pose the very risks the MCP is designed to mitigate.  See Malloch v. Hanover, 472 Mass. 783, 791 (2015) ("We interpret separate sections of statutes as a whole to produce internal consistency, . . . and to give a 'rational and workable effect'"

additional requirements.

[citations omitted]); 310 Code Mass. Regs. § 40.0002(1)(a)(1) (2014) (MCP provides "for the protection of health, safety, public welfare and the environment)."

<u>Judgment affirmed</u>.