WILLIAM PEPIN & another[1] *vs.* DIVISION OF FISHERIES AND
WILDLIFE.

Hampden. October 8, 2013. - February 18, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Administrative Law,* Agency's authority, Agency's interpretation of statute,
Decision, Hearing, Proceedings before agency, Regulations, Summary
decision. *Practice, Civil,* Review of administrative action. *Regulation.
Division of Fisheries and Wildlife. Massachusetts Endangered Species Act.*

Discussion of the Massachusetts Endangered Species Act, G. L. c. 131A,
§§ 1-7, authorizing the division of fisheries and wildlife to delineate as
significant habitats certain geographic areas of the Commonwealth in
which property development is generally barred, and prohibiting human
interference with certain protected species. [215-219]
Discussion of 321 Code Mass. Regs. §§ 10.11-10.26, a regulatory scheme
promulgated by the division of fisheries and wildlife under the Mas-
sachusetts Endangered Species Act, G. L. c. 131A, §§ 1-7, that establishes
a priority habitat designation. [219-221]
This court concluded that a regulatory scheme promulgated by the division of
fisheries and wildlife under the Massachusetts Endangered Species Act
(act), G. L. c. 131A, §§ 1-7, establishing a priority habitat designation,
was valid, given that the significant habitat scheme established by the act
stringently restricts property development and provides landowners with
robust procedural protections before doing so, and the priority habitat
regulations neither constitute a comparable bar against development nor
require comparable procedural mechanisms. [221-226]
The defendant division of fisheries and wildlife (division) properly adopted
the decision of a magistrate granting a directed decision in favor of the
division without a hearing in the plaintiffs' challenge of the division's
designation of their property as a priority habitat, where the magistrate
judge found that the plaintiffs' testimony contained factually unsupported
or inadequately supported conclusions, expert-type opinion testimony, lay
opinion unsupported by firsthand observation, and legal opinion and argu-
ment and presented insufficient evidence that the division deviated from its
guidelines in delineating the priority habitat for the eastern box turtle.
[226-229]

CIVIL ACTION commenced in the Superior Court Department on
September 1, 2009.

[1]Marlene Pepin.

A motion for judgment on the pleadings was heard by *C. Jeffery. Kinder*, J., and motions for summary judgment were heard by *Constance M. Sweeney*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*William J. Murray* for the plaintiffs.

*Matthew C. Ireland*, Assistant Attorney General, for the defendant.

The following submitted briefs for amici curiae:

*Damien M. Schiff & Jonathan Wood*, of California, & *Donald R. Pinto, Jr.*, for Pacific Legal Foundation.

*Jason C. Rylander & Michael P. Senatore*, of the District of Columbia, for Defenders of Wildlife & another.

*Jeffrey B. Augello & David S. Jaffe*, of the District of Columbia, for National Association of Home Builders.

*Douglas H. Hallward-Driemeier, Jacob Scott, Jacob M. Heller, & Kevin P. Budris* for Massachusetts Audubon Society & others.

*Paul Peter Nicolai* for Economic Development Council of Western Massachusetts & another.

*Benjamin Fierro, III*, for Home Builders Association of Massachusetts, Inc.

*Ann M. Risso* for Nature Conservancy.

LENK, J. William and Marlene Pepin (petitioners) own approximately thirty-six acres of land in Hampden.[2] Their ability to construct a home on this land is restricted by the property's delineation as a "priority habitat" for the eastern box turtle, a "species of special concern" under 321 Code Mass. Regs. § 10.90 (2012). The property has been so designated by the division of fisheries and wildlife (division), a unit of the Department of Fish and Game, pursuant to the implementing regulations of the Massachusetts Endangered Species Act, G. L. c. 131A, §§ 1-7 (MESA).

---

[2] We acknowledge the amicus briefs of the Home Builders Association of Massachusetts, Inc.; Economic Development Council of Western Massachusetts and Westmass Area Development Corporation; National Association of Home Builders; and Pacific Legal Foundation on behalf of the petitioners. We also acknowledge the amicus briefs of the Nature Conservancy; Massachusetts Audubon Society, Massachusetts Association of Conservation Commissions, and Conservation Law Foundation; and Defenders of Wildlife and National Wildlife Federation on behalf of the division of fisheries and wildlife (division).

MESA authorizes the division to designate certain areas as "significant habitats" of endangered or threatened species. G. L. c. 131A, § 4. Development of land within significant habitats is sharply restricted. See G. L. c. 131A, §§ 2-4. The division also has promulgated regulations establishing a second type of protected habitat, denoted "priority habitat," to protect species that are either endangered or threatened, or that fall into a third category of "species of special concern." 321 Code Mass. Regs. §§ 10.11-10.26 (2012). The petitioners challenge the validity of the priority habitat regulations insofar as they allow the division to designate priority habitat without affording landowners the procedural protections statutorily due to those owning property within significant habitats. Because we conclude that the priority habitat regulations are a reasonable implementation of the enabling statute, we affirm their validity.

We are asked also to decide whether, in adjudicating the petitioners' challenge to the application of the priority habitat mapping guidelines to their property, a Department of Fish and Game magistrate properly directed a decision in favor of the division without holding a hearing. Because the petitioners did not meet their burden of demonstrating that the division improperly delineated their property as priority habitat, we conclude that granting such a directed decision was proper.

1. *Factual background and prior proceedings.* We summarize the following undisputed facts. The petitioners' property in Hampden County consists of two building lots, totaling approximately thirty-six acres in area. They intend to build a home on the larger lot. However, in 2006, a year after the division adopted revised MESA regulations, the area encompassing the petitioners' property was delineated a priority habitat for the eastern box turtle, a species of special concern. See 321 Code Mass. Regs. § 10.90. In accordance with the division's guidelines, the delineation was based on a private citizen's sighting, in 1991, of a female box turtle of reproductive age, on or near the parcel in question. The turtle was identified by a professional herpetologist at the Audubon Society Laughing Brook Sanctuary.

As a result of the priority habitat designation, the petitioners

face certain limitations before they can commence construction. Pursuant to 321 Code Mass. Regs. § 10.18 (2010), plans for construction projects located within priority habitats must be submitted to the division for review before physical work can begin. Accordingly, in January, 2007, the petitioners submitted to the division a project review checklist and supporting materials in connection with their proposal to construct a single-family home on their property. The division determined that the project, as proposed, had the potential to result in a "take" of a State-listed species, the eastern box turtle, meaning that it might harm the turtle or disrupt its habitat. See G. L. c. 131A, § 1. After the petitioners submitted revised materials, the division determined that the project would not result in a take, provided that a deed restriction and conservation easement were recorded in the Hampden County registry of deeds prior to commencement of work on the project.

In September, 2008, the petitioners requested reconsideration of the delineation of their property as priority habitat. See 321 Code Mass. Regs. § 10.12(8) (2010). As part of the requested review, a turtle conservation biologist and regulatory review manager from the division visited the petitioners' property with the petitioners' attorney to conduct a habitat evaluation. This site visit indicated that the location of the proposed project was within the priority habitat area for the eastern box turtle, and that the property, with its upland deciduous forestry, was indeed "ideal habitat" for the turtle. Determining that the habitat mapping procedures for the eastern box turtle were implemented properly in accordance with the regulations, and that the location of the proposed project was within the priority habitat for the eastern box turtle, the division ultimately denied the request.

The petitioners requested an adjudicatory hearing pursuant to 321 Code Mass. Regs. § 10.25(1) (2010), which provides for informal hearings in accordance with the procedures set forth in 801 Code Mass. Regs. §§ 1.02, 1.03 (1998). The parties proceeded with such an informal hearing and agreed to an expedited hearing schedule. The petitioners raised two issues. First, the petitioners challenged the validity of the division's method for delineating priority habitats, which does not afford landowners the same procedural protections due under MESA to those own-

ing property within significant habitats. Second, the petitioners argued that the criteria set forth in 321 Code Mass. Regs. § 10.12, regarding delineation of priority habitat, were not applied properly when the division reconsidered and confirmed the delineation of the petitioners' property as priority habitat for the eastern box turtle. As the first claim entailed a direct challenge to the validity of the regulation, the magistrate granted the division's motion to dismiss that claim without prejudice to the petitioners' right to seek judicial review in the Superior Court. Cf. *Salisbury Nursing & Rehabilitation Ctr., Inc.* v. *Division of Admin. Law Appeals*, 448 Mass. 365, 374-375 (2007) (substantive validity of agency regulation may not be challenged before division of administrative law appeals).

After the submission of written testimony, the division moved for a directed decision in its favor on the second claim, arguing that, "[g]iven the array of scientific and technical criteria that the [d]ivision considers when determining whether a geographic location is [p]riority [h]abitat for a [S]tate-listed species, . . . the unsupported opinions of an unqualified lay person on such matters are wholly insufficient" to carry the petitioners' burden. The magistrate granted the division's motion, thus obviating the need for an evidentiary hearing and the attendant cross-examination of witnesses. The magistrate concluded that, "as a matter of law and fact, [p]etitioners . . . presented no credible evidence to support their final claim in this appeal." The division adopted the decision of the magistrate.

The petitioners sought review in the Superior Court, pursuant to G. L. c. 30A, § 14, where they also pursued their claim for declaratory relief regarding the validity of the priority habitat regulations. A Superior Court judge denied the petitioners' motion for judgment on the pleadings and affirmed the division's decision adopting the magistrate's directed decision. A different Superior Court judge entered summary judgment in favor of the division on the petitioners' claim for declaratory relief. That judge reasoned that the priority habitat regulations "are consistent with MESA's prohibition on the 'take' of any listed species and MESA's broad purpose of protecting and conserving wildlife and wildlife habitat" and, thus, that the regulations do not

exceed the scope of the division's authority as granted by MESA. The petitioners appealed, and we transferred the case to this court on our own initiative.

2. *Enactment of MESA.* The Legislature enacted MESA, a statute that we have not previously had occasion to construe, in 1990, to conserve plant and animal species within the Commonwealth and to protect their habitats. 1990 Senate Doc. No. 1768. At the time of MESA's enactment, the Commonwealth had lost seventy-two species over the prior 150 years. Diane Dumanoski, Sweeping Mass. Law on Endangered Species Is Signed, Boston Globe, Dec. 28, 1990, at 1. Over thirty other States already had enacted species-conservation laws, *id.*, and the Federal Endangered Species Act, 16 U.S.C. §§ 1531-1544 (Federal Act), had been in existence for seventeen years. The Federal Act contemplates cooperation "to the maximum extent practicable with the States," 16 U.S.C. § 1535(a), but the Federal government may enter into a cooperative agreement with a State for the purpose of species conservation only if "the State agency has established acceptable conservation programs, consistent with the purposes and policies of [the Federal Act], for all resident species of fish or wildlife in the State which are deemed by the Secretary to be endangered or threatened . . . ." 16 U.S.C. § 1535(c)(1)(B). See 16 U.S.C. § 1535(c)(2)(B) (same provision for endangered or threatened plant species).

MESA establishes conservation programs that parallel the Federal Act in a number of ways, while also expanding protection for species' habitats and increasing the number of species covered. At the time of MESA's enactment, the Federal Act covered only twenty-two of the 400 at-risk species in Massachusetts. Dumanoski, *supra.* MESA extends protection to all at-risk species within the Commonwealth by authorizing the division to compile a list of such species based on the "best scientific evidence available," G. L. c. 131A, § 4, as the Federal Act does. See 16 U.S.C. § 1533(a)(1), (b)(1)(A). Also like the Federal Act, see 16 U.S.C. §§ 1533(a)(3)(A)(i), 1538(a)(1)(B), MESA prohibits human interference with at-risk species or their habitats, see G. L. c. 131A, § 2, and authorizes the division to regulate habitats of special significance for the survival of certain species, see G. L. c. 131A, § 4. Indeed, MESA goes beyond the

Federal Act by explicitly prohibiting any unauthorized alteration of such habitat by all individuals or entities, see G. L. c. 131A, § 2, whereas the Federal Act's designation of "critical habitat" affects only Federal agencies and activities requiring Federal permits, see 50 C.F.R. § 17.94 (2012). MESA thus works to prevent the decline of at-risk species by protecting species themselves, as well as the habitats in which they live, from undue human encroachment.

3. *Statutory and regulatory framework.* MESA has two key components. First, it authorizes the division to delineate as significant habitats certain geographic areas of the Commonwealth, areas in which property development is generally barred. Second, it prohibits human interference with certain protected species. To implement these directives, the statute establishes a taxonomy of at-risk species as either endangered, threatened, or of special concern (State-listed species), according to the relative danger of extinction confronting them.[3] The director of the division, in consultation with the natural heritage and endangered species advisory committee, and based on biological data, is required to list species in one of these three categories where appropriate, and to review this list every five years. G. L. c. 131A, § 4.

a. *Significant habitat scheme.* Recognizing habitat degradation as among the leading causes of species decline, 1990 Senate

---

[3]An "endangered species" is defined as "any species of plant or animal in danger of extinction throughout all or a significant portion of its range including, but not limited to, species listed from time to time as 'endangered' under the provisions of the Federal Endangered Species Act of 1973, as amended, and species of plants or animals in danger of extirpation, as documented by biological research and inventory." G. L. c. 131A, § 1.

A "threatened species" is defined as "any species of plant or animal likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range including, but not limited to, species listed from time to time as 'threatened' under the provisions of the Federal Endangered Species Act of 1973, as amended, and any species declining or rare as determined by biological research and inventory and likely to become endangered in the foreseeable future." *Id.* A "species of special concern" is defined as "any species of plant or animal which has been documented by biological research and inventory to have suffered a decline that could threaten the species if allowed to continue unchecked or that occurs in such small numbers or with such a restricted distribution or specialized habitat requirements that it could easily become threatened within the commonwealth." *Id.*

Doc. No. 1768, MESA creates a framework for designating significant habitats in order to protect the habitats of endangered and threatened species.[4] G. L. c. 131A, § 4. The director is authorized to delineate significant habitats by regulation, after a public hearing pursuant to the provisions of G. L. c. 30A, and on the basis of the best scientific evidence available. G. L. c. 131A, § 4. Qualifying significant habitats are to be reviewed and designated on a yearly basis. *Id.*

Property located within a significant habitat is presumptively not to be developed; "[n]o alteration of a significant habitat may commence without a written permit issued by the director." G. L. c. 131A, § 5. Alteration, in turn, is defined as "to change the physical or biological condition of a habitat in any way that detrimentally affects the capacity of the habitat to support a population of endangered or threatened species." G. L. c. 131A, § 1.

A proponent of development in a significant habitat must submit detailed information to the division, and "[a] permit shall be granted only upon a finding by the director that the proposed action will not reduce the viability of the significant habitat to support the endangered or threatened species population involved." G. L. c. 131A, § 4. An individual who impermissibly alters a significant habitat, as prohibited by either statute or regulation, is subject to any combination of a fine of between $1,000 and $10,000, imprisonment of up to ninety days, and a civil assessment not to exceed $10,000. G. L. c. 131A, § 6 (*b*), (*c*).

Given that a significant habitat designation often entails a serious restriction on property rights, MESA affords certain protections to affected landowners. First, landowners are entitled to advance written notice that the land is being considered for designation as a significant habitat. G. L. c. 131A, § 4. Second, a public hearing is required before any decision is made on the proposed designation. *Id.* Third, the habitat designation must be recorded in the registry of deeds in the county in which the land is located, *id.*, such that the designation will be apparent to purchasers in a title examination. Finally, a landowner aggrieved

---

[4]The habitats of species of special concern are not eligible for designation as significant habitats. See G. L. c. 131A, § 4.

by a final decision of the director in designating a significant habitat may file an action in the Superior Court "to determine whether such decision constitutes a taking requiring compensation under the Constitution of the United States." G. L. c. 131A, § 5 (*e*).

MESA authorizes the division to "adopt any regulations necessary to implement the provisions of [G. L. c. 131A]" in accordance with the procedures outlined in G. L. c. 30A. See G. L. c. 131A, § 4. The division's regulations implementing the prohibition on the alteration of significant habitats essentially elaborate on the statutory requirements. See 321 Code Mass. Regs. §§ 10.30-10.72. The regulations also clarify that, although the statute prohibits development in significant habitats, proponents of such development may be granted a variance where one is "necessary to avoid permit conditions or the denial of a permit that so restricts the use of property as to constitute an unconstitutional taking without compensation," provided that there are no reasonable alternatives to development and that the project can be conditioned to protect the viability of the habitat. 321 Code Mass. Regs. § 10.70.

b. *Prohibition on "takes" of State-listed species.* In addition to setting forth a system for delineating significant habitat, MESA prohibits human interference with State-listed species by providing that "no person may take, possess, transport, export, process, sell or offer for sale, buy or offer to buy, nor shall a common or contract carrier knowingly transport or receive for shipment, any plant or animal species listed as endangered, threatened or of special concern or listed under the Federal Endangered Species Act." G. L. c. 131A, § 2. Of these prohibited activities, only the term "take" is statutorily defined, and broadly so, to include both harming species themselves and disturbing their habitats. To "take" is to "harass, harm, pursue, hunt, shoot, hound, kill, trap, capture, collect, process, disrupt the nesting, breeding, feeding or migratory activity or attempt to engage in any such conduct, or to assist such conduct, and in reference to plants, to collect, pick, kill, transplant, cut or process or attempt to engage or to assist in any such conduct."[5] G. L. c. 131A, § 1. But the division is authorized to permit takes and

---

[5]This expansive definition of "take" tracks the definition in the implement-

other forms of interference for "scientific, conservation, management or educational purposes," for falconry purposes, for propagation from captivity, or to protect human health. G. L. c. 131A, § 3.

Violation of this prohibition on takes can result in any combination of a fine of up to $500, imprisonment of up to ninety days, and a civil assessment not to exceed $10,000. G. L. c. 131A, § 6 (*a*), (*c*). "The commission of a prohibited act with respect to each individual animal or plant, or part thereof, shall constitute a separate violation," G. L. c. 131A, § 6 (*d*), and subsequent violations are subject to enhanced penalties, G. L. c. 131A, § 6 (*a*).

In promulgating regulations to implement the take provision, the division has established a second type of habitat designation, that of "priority habitat," for which MESA makes no express provision. See 321 Code Mass. Regs. §§ 10.11-10.26. The regulatory scheme involving priority habitat designation enables the division to review projects on a case-by-case basis and to give direction to landowners concerning how to avoid or mitigate impermissible takes of State-listed species or their habitat. See 321 Code Mass. Regs. § 10.12(1) ("Priority habitats are [u]sed for screening projects and activities that may result in the [t]ake of State-listed species and to provide guidance to [r]ecord [o]wners regarding a [p]roject or [a]ctivity through consultation with the [d]ivision"). Unlike the significant habitat designation, which protects only endangered and threatened species, 321 Code Mass. Regs. § 10.31, the priority habitat designation applies to all three categories of species (endangered, threatened, and of special concern). See 321 Code Mass Regs. § 10.12(2). Priority habitats are delineated according to habitat mapping guidelines, prepared for each species, "that identify the important habitat features, and that describe the methodol-

ing regulations of the Federal Act, which provide that "[h]arm in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (2013). See *Babbitt* v. *Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 696-701 (1995) (upholding regulation as reasonable interpretation of statute).

ogy by which [p]riority [h]abitats are delineated." 321 Code Mass. Regs. § 10.12(3). The regulations provide that delineations "shall be based on the best scientific evidence available and shall include examination of individual occurrence records," in addition to certain other criteria. 321 Code Mass. Regs. § 10.12(2). Delineations are to be reevaluated every four years; a sixty-day public comment period follows the reevaluation of the priority habitat map, after which time the final map and a summary of public comments are posted on the division's Web site. 321 Code Mass. Regs. § 10.12(6)(a), (b).

No project or activity may commence on property located within a priority habitat until the division has reviewed the project and determined whether a take of protected species will result.[6] 321 Code Mass. Regs. § 10.18(1). In contrast to the statute, which provides that the division will bring enforcement actions to prosecute takes that have already occurred, see G. L. c. 131A, § 6 (a), the regulations enable the division to assist in the prevention of such takes. To that end, the regulations require a landowner to demonstrate that the proposed project does not result in a take; a project may proceed without conditions or a permit only if the landowner has made such a demonstration. 321 Code Mass. Regs. §§ 10.18(2), 10.19. The process, in effect, yields a determination that the project will result in a "no" take, a "conditional" no take, or a take. A conditional no take, such as the petitioners' project, will require compliance with certain conditions in order to avoid a take. See 321 Code Mass. Regs. § 10.18(2)(a).

Even if the project is deemed to result in a take, the division may nonetheless issue a "conservation and management permit," "provided there is a long-term [n]et [b]enefit to the conservation of the impacted species." 321 Code Mass. Regs. § 10.23(1). Such a permit may issue where the landowner adequately has assessed alternatives to the proposed project, an

---

[6]Certain types of development are exempted from the priority habitat review process. Examples of development exemptions include certain construction of residential dwellings on infill lots; certain acts of repair, maintenance, replacement, or addition; and the normal maintenance and improvement of land in agricultural or aquacultural use, or land adjacent to or in the immediate vicinity of land in agricultural or aquacultural use. See 321 Code Mass. Regs. § 10.14.

insignificant portion of the local population of State-listed species would be impacted by the project, and the landowner agrees to comply with various conditions and to carry out a conservation and management plan that inures to the long-term conservation of the protected species. 321 Code Mass. Regs. § 10.23(2). If the landowner has taken all reasonable steps to avoid or mitigate species impact, but still is unable to demonstrate a long-term net benefit to species conservation, the terms and conditions may entail financial or in-kind contribution to an off-site conservation plan. 321 Code Mass. Regs. § 10.23(3).

Here, the petitioners mount a facial challenge to the validity of the priority habitat regulations. They argue that the regulations exceed the authority granted to the division and are inconsistent with MESA, insofar as they restrict property development without affording landowners the protections that the statute guarantees to owners of private property designated as significant habitat. The petitioners maintain also that the division erred in adopting the decision of the magistrate who adjudicated their challenge to the division's application of the priority habitat mapping guidelines to their property and directed a decision in favor of the division, thereby depriving them of their right to cross-examine the division's witnesses.

4. *Discussion.* a. *Validity of priority habitat regulations.* Duly promulgated regulations of an administrative agency are presumptively valid and "must be accorded all the deference due to a statute." *Massachusetts Fed'n of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. 763, 771 (2002), quoting *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 723, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette*, 464 U.S. 936 (1983). The burden is on the party challenging the regulation to "demonstrate that [it] is invalid or illegal." *Entergy Nuclear Generation Co.* v. *Department of Envtl. Protection*, 459 Mass. 319, 329 (2011). Regulations are invalid "when the agency utilizes powers 'neither expressly nor impliedly granted by statute.' " *Commonwealth* v. *Maker*, 459 Mass. 46, 49-50 (2011), quoting *Morey* v. *Martha's Vineyard Comm'n*, 409 Mass. 813, 818 (1991). Nor may regulations validly be promulgated where they "are in conflict with the statutes or exceed the authority conferred by the statutes by

which such [agency] was created." *Telles* v. *Commissioner of Ins.*, 410 Mass. 560, 564 (1991), quoting *Bureau of Old Age Assistance of Natick* v. *Commissioner of Pub. Welfare*, 326 Mass. 121, 124 (1950).

"[W]e look to the statute as a whole to determine the scope of the agency's power." *Commonwealth* v. *Maker, supra* at 50, quoting *Grocery Mfrs. of Am., Inc.,* v. *Department of Pub. Health,* 379 Mass. 70, 75 (1979). "[A] regulation . . . need not necessarily find support in a particular section of [the enabling statute]; it is enough if it carries out the scheme or design of the chapter and is thus consistent with it." *Entergy Nuclear Generation Co.* v. *Department of Envtl. Protection, supra* at 331, quoting *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.,* 363 Mass. 474, 494 (1973). However, an agency may not create additional requirements not contemplated by the enabling statute. See *Commonwealth* v. *Maker, supra* at 51.

As discussed *supra*, MESA sets out a scheme that prohibits takes of all State-listed species, see G. L. c. 131A, §§ 2-3, and that protects the habitats of endangered and threatened species by designating them significant habitats. See G. L. c. 131A, §§ 4-5. The petitioners maintain that the priority habitat regulations are facially invalid insofar as they restrict development of private property without providing the protections guaranteed by the statute to landowners located within significant habitats. The petitioners do not challenge the division's ability to protect through regulation other habitat areas in addition to the statutorily authorized significant habitats; however, they argue that MESA's creation of the significant habitat designation, and attendant procedural protections for landowners, evinces a legislative intent to afford all landowners such protections whenever property development is restricted.

The division argues in response that the priority habitat regulations should be upheld as a reasonable means of implementing MESA's objectives. Contrary to the petitioners' argument that priority habitats are merely significant habitats with "cosmetic differences," and thus circumvent the protections afforded by significant habitats, the division contends that priority habitats in fact serve a different statutory purpose. Priority habitat designations, the division asserts, implement MESA's take prohibi-

tion by mapping known areas used as habitats by all three categories of protected species so as to "screen[] projects or activities that may result in the take of [S]tate-listed species." 321 Code Mass. Regs. § 10.12(1). By contrast, significant habitat designations are designed "to carve out in advance exceptional areas containing habitat with features worthy of a heightened level of protection" for only the most at-risk species.

As was the case with a different environmental statute that we interpreted recently, "the purpose of [MESA] is unambiguous." See *Entergy Nuclear Generation Co.* v. *Department of Envtl. Protection, supra* at 329 (interpreting Clean Waters Act, G. L. c. 21, §§ 26-53). Appreciating that "the degradation and destruction of wild plant and animal habitats are the greatest threats to those species that are in danger of serious decline or extirpation," the Legislature enacted MESA "to protect the habitats of [endangered, threatened and special concern species] to the greatest extent possible." 1990 Senate Doc. No. 1768. To effectuate this purpose, MESA codifies a comprehensive definition of illegal takes to include harm to habitats in the form of "disrupt[ion of] the nesting, breeding, feeding or migratory activity or attempt to engage in any such conduct, or to assist such conduct," G. L. c. 131A, § 1, and contemplates that the division will promulgate regulations to implement this prohibition. See G. L. c. 131A, § 6 ("Any person who violates the provisions of the [take prohibition] *or the rules and regulations promulgated thereunder,* shall be punished . . ." [emphasis supplied]). MESA also prohibits all alteration of significant habitats, as designated by the division, G. L. c. 131A, § 2, and delegates to the division broad authority to "adopt any regulations necessary to implement the provisions of [G. L. c. 131A]," G. L. c. 131A, § 4.

Such broad authority extends to the formulation of the priority habitat concept as a means of implementing MESA's prohibition on takes. "We will not substitute our judgment as to the need for a regulation, or the propriety of the means chosen to implement the statutory goals, for that of the agency, so long as the regulation is rationally related to those goals." *Entergy Nuclear Generation Co.* v. *Department of Envtl. Protection, supra* at 331-332, quoting *American Family Life Assurance Co.* v. *Commissioner of Ins.*, 388 Mass. 468, 477, cert. denied sub

nom. *American Family Life Assurance Co.* v. *Hiam*, 464 U.S. 850 (1983).

Here, the division has determined that the priority habitat scheme is an appropriate means of protecting "species put in harm's way by a project or activity that disrupts behavior essential to survival," so as to advance the larger statutory purpose of protecting State-listed species and their habitats "to the greatest extent possible." 1990 Senate Doc. No. 1768. The priority habitat regulations serve as a tool for mapping the habitats of all State-listed species, in order to provide information to both landowners and the division about planned property development that could interfere with such species. The review process outlined by the regulations equips the division with the capacity to preempt otherwise irreparable harm to habitats, a central objective of MESA embodied in the take prohibition. Were it not for the priority habitat regulations, the division would have no centralized way of obtaining information concerning planned property development in areas not designated significant habitat,[7] and would be dependent on bringing suit only after harm had already occurred in order to enforce the take prohibition. In the absence of the priority habitat regulations, the division also would have to rely exclusively on the significant habitat provision of MESA, whose flat bar against development could prove unduly restrictive in some circumstances, as a way to protect habitat. Thus, the regulations serve to implement the existing statutory provision prohibiting takes of State-listed species, which is critical to the operation of MESA as a whole.

That MESA creates a scheme for designating and regulating significant habitats of endangered and threatened species does not preclude the division from enacting regulations to address the more general problem of preventing takes of all State-listed species in a manner that is more tailored to individual projects and habitats. As we consistently have held, "[s]pecific statutory

---

[7]It is worth noting, however, that, to date, the division has not designated any area in the Commonwealth as significant habitat. See 321 Code Mass. Regs. § 10.99 (titled "Designated Significant Habitats: Reserved"; containing no entries). By contrast, as the amicus Western Massachusetts Development Counsel notes, 339,840 acres in western Massachusetts alone have been designated priority habitat. It appears that, in practice, all of the division's habitat management is accomplished through the priority habitat scheme.

authority to act in a particular respect does not bar consistent action under general statutory authority." *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health, supra* at 76. See *Water Dep't of Fairhaven* v. *Department of Envtl. Protection,* 455 Mass. 740, 751 (2010). The petitioners concede as much by acknowledging that the priority habitat scheme is a proper exercise of the division's authority to implement the take prohibition. Nonetheless, they take issue with the regulations' failure to afford the same protections to landowners to which those owning property within significant habitat are entitled, and argue that the regulations conflict with MESA to the extent that those protections are absent.

While it is true that the priority habitat regulations do not offer landowners comparable protections to the significant habitat framework, neither are the burdens imposed on landowners by priority habitats comparable to those imposed by significant habitats. MESA states simply that "[e]xcept as otherwise provided in this chapter, no person may alter significant habitat." G. L. c. 131A, § 2. "A permit [to alter significant habitat] shall be granted only upon a finding by the director that the proposed action will not reduce the viability of the significant habitat to support the endangered or threatened species population involved." G. L. c. 131A, § 5. By contrast, the priority habitat regulations are designed to facilitate property development, albeit in an environmentally sensitive manner. The project review process can result either in a determination that development will not result in a take, in which case it may proceed unhindered; a determination that a project has the potential to result in a take, in which case mitigating conditions will be imposed on development; or a determination that a project *will* result in a take, in which case a more rigorous permitting process will be required before development can proceed. See 321 Code Mass. Regs. § 10.18(2).

To be sure, the conditions that may be imposed as part of the review process can restrict land use in certain respects, or even require significant financial expenditure.[8] But the priority habitat

[8]For example, such conditions may include conveying open space parcels to the division; granting a recorded conservation restriction over parts of the land to the division; making payments to a conservation fund; and the construction

scheme is ultimately a flexible one[9] that gives guidance to landowners on structuring their projects to avoid committing takes and, in so doing, ensures them a safe harbor from liability under the statute.[10] Instead of unconditionally prohibiting development that may result in the take of State-listed species, the scheme permits such takes, so long as adequate mitigation is provided. Although on-site mitigation is preferred, the regulations provide for a variety of mitigation options, including support for off-site habitat protection and conservation research that will accrue to the future benefit of the species. See 321 Code Mass. Regs. § 10.23(6). Thus, whereas the Legislature established a significant habitat scheme that both stringently restricts property development and provides landowners with robust procedural protections before doing so, the priority habitat regulations neither constitute a comparable bar against development, nor require comparable procedural mechanisms.

b. *Directed decision in favor of the division.* The petitioners argue that the magistrate's allowance of the division's motion

of barriers, road crossings, and trenches, overseen by a qualified wildlife biologist.

[9]The division's statistics indicate that the majority of projects proposed in priority habitats (seventy-five per cent) proceed without any modification or conditions, after having been determined not to pose a threat to the species in question. Division of Fisheries and Wildlife, Fiscal Year 2009 National Heritage Endangered Species Program Regulatory Review Activity Summary at 4 (2009). Another twenty-two per cent of projects are approved with conditions in order to avoid a take. *Id.* Only three per cent of projects are determined to pose a threat to species such that a conservation and management permit is required. *Id.*

[10]The regulations require, in aid of such a safe harbor, that landowners bear the burden of showing that the proposed project or activity will not result in a take. See 321 Code Mass. Regs. § 10.19. Where the proposed project or activity is deemed a "conditional no take" or a "take," the landowner nonetheless can attain safe harbor by agreeing to the conditions imposed or by obtaining the requisite permit, as applicable. Were the landowner to forsake a safe harbor, however, and forge ahead with the proposed project or activity, that alone would not be tantamount to a proven violation of G. L. c. 131A, § 2. General Laws c. 131A, § 6 (*c*), the enforcement provision, imposes on the division the burden of proving that a proscribed interference with a State-listed species or its habitat has occurred, and the division acknowledges as much. Were it otherwise, the division, by virtue of burden-shifting implementing regulations, impermissibly would be absolved of its statutory duty to prove the proscribed take, either by a preponderance of the evidence or beyond a reasonable doubt, depending upon the sanction sought.

for a directed decision, without a hearing, impermissibly deprived them of their statutory right to cross-examine the division's witnesses on the question whether their property was properly delineated as priority habitat. The division maintains that an adjudicatory hearing with the opportunity to confront adverse witnesses is required only where the petitioners present sufficient evidence to survive a directed decision, which the petitioners here failed to do.

Pursuant to the regulations on informal hearings, all parties have the right to "question or refute any testimony including an opportunity to cross-examine adverse witnesses."[11] 801 Code Mass. Regs. § 1.02(10)(g)(1)(d). The regulations also encourage parties to engage in voluntary discovery. See 801 Code Mass. Regs. § 1.02(8)(a). However, not all claims that are entitled to an adjudicatory proceeding necessarily reach the hearing stage. The regulations also contemplate that parties may submit dispositive motions to be decided by the presiding officer with or without a hearing. See 801 Code Mass. Regs. § 1.02(7)(c) ("A party may request rulings or relief in writing at any time or orally during a hearing. After providing notice to the other parties, the [a]gency or [p]residing [o]fficer shall rule on the request with or without a hearing"). "[T]he burden of persuasion through the introduction of evidence is upon the petitioner . . . to show by a preponderance of evidence entitlement to the favorable administrative determination sought from the agency." A.J. Cella, Administrative Law and Practice § 243 (1986). The regulations thereby provide a mechanism for resolving a claim summarily where a petitioner has not sustained his or her case.

We have held that this type of procedure does not contravene the requirements of either the Administrative Procedure Act or due process. See *Kobrin* v. *Board of Registration in Med.*, 444 Mass. 837, 846 (2005) ("neither the statute [G. L. c. 112, § 5, providing for a hearing pursuant to G. L. c. 30A] nor due process required the board to hold a hearing to take evidence concern-

---

[11]The priority habitat regulations provide that parties challenging a final decision by the division have the right to an adjudicatory hearing governed by the informal hearing rules of 801 Code Mass. Regs. §§ 1.02-1.03. See 321 Code Mass. Regs. § 10.25(1).

ing undisputed facts. Such a hearing would be a meaningless exercise"). See also *Massachusetts Outdoor Advertising Council v. Massachusetts Advertising Bd.*, 9 Mass. App. Ct. 775, 785-786 (1980) ("administrative summary judgment procedures do not transgress statutory or constitutional rights to a hearing where those procedures are such that they allow the agency to dispense with a hearing only when the papers or pleadings filed conclusively show on their face that the hearing can serve no useful purpose, because a hearing could not affect the decision").

Here, the allowance of a directed decision in favor of the division was proper where the magistrate found that the petitioners' testimony contained "factually unsupported or inadequately supported conclusions, expert-type opinion testimony, lay opinion unsupported by first hand observation, and legal opinion and argument" and presented insufficient evidence that the division deviated from its guidelines in delineating the priority habitat for the eastern box turtle.[12] The petitioners agreed to an informal hearing, with an expedited schedule that provided for filing written testimony in advance of the hearing date. Their testimony largely called into question the credibility of the individual who sighted the turtle in 1991, and averred that no turtles have been seen since on the property or its environs, including by any division staff who visited the location. The testimony further raised, but did not answer, questions regarding the fate of the turtle spotted in 1991,[13] and stated generally that the division did not apply required criteria when making

[12]Our decision should not be construed as sanctioning directed decisions before parties have had a reasonable opportunity to depose their opponents or otherwise to engage in appropriate discovery. Here, however, there is no suggestion that the petitioners were thwarted in an attempt to depose the division's witnesses, nor do they complain or being deprived of other relevant avenues of discovery. The parties agreed to an informal hearing process on an expedited schedule, which included a period of discovery, but it appears from the record that neither party availed itself of this opportunity.

[13]A large portion of the petitioners' rebuttal testimony is dedicated to rhetorical questions concerning the individual who identified the turtle in 1991, for example:

"So, if [the observer] did not return the turtle to the roadway, what did she do with it? Does anyone at [the division] know? Has anyone at [the division] made even the slightest effort to find out? Did [the observer] leave the [t]urtle on the grounds at Laughing Brook, a most suitable habitat for the turtle? After carrying the [t]urtle illegally to Laughing

its delineation, such as evidence of breeding, persistence of species in the area, number of species, and the variety of life stages of the species present. The testimony did not, however, put forward specific instances of the division's misapplication of its regulatory criteria, or otherwise controvert the testimony of the division's witnesses.

The division's written testimony from its turtle conservation biologist and regulatory review manager, by contrast, stated that the 1991 sighting of a reproductive-aged adult female turtle was consistent with scientific studies documenting movement distances of eastern box turtles in Massachusetts, as well as multiple sightings of such turtles east, northeast, and west of the petitioners' property, which supported the credibility of the 1991 sighting adjacent to the parcel in question. The observation of a nesting female and hatchlings near the property in 1993 was also noted. The division's witnesses explained that the regulatory criteria were applied by evaluating radio-tracking studies of eastern box turtles in the Hampden area. Those studies were confirmed by the 1991 occurrence record of the turtle, as well as multiple other occurrence records evincing a local population of turtles in and around the petitioners' property linked to other priority habitat areas in Hampden by migration, dispersal, and gene flow. The continued suitability of the petitioners' property as habitat for eastern box turtles was also confirmed when the staff visited the site in 2008.

The petitioners' written testimony amounted to a set of conclusory allegations, and no more. They proffered no evidence of any instance where the division improperly applied its regulatory criteria. Thus, the division properly adopted the magistrate's decision granting a directed decision in favor of the division.

*Judgment affirmed.*

Brook, did she carry the [t]urtle illegally to some other appropriate location in the vicinity of Laughing Brook? Did she take it home? Why would she bring the turtle to the [p]roject [s]ite, which according to her observation report, she believed was the location of a planned [thirty-one] unit residential development. Therefore, the [t]urtle was last seen at Laughing Brook, more than three miles from the [p]roject [s]ite."